IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CONSTELLIUM ROLLED PRODUCTS
RAVENSWOOD, LLC,

       Plaintiff,

v.            CIVIL ACTION NO. 2:18-cv-01404

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO/CLC, et al.,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court in this consolidated action is Defendant United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC's ("Union") motion for a preliminary injunction pending arbitration. (ECF No. 12; 2:18-cv-1414, ECF No. 1.)[1] For the reasons discussed herein, the Court **GRANTS** the motion. (ECF No. 12; 2:18-cv-1414, ECF No. 1.)

*I. BACKGOUND*

This case arises out of Plaintiff Constellium Rolled Products Ravenswood, LLC's ("Constellium") unilateral decision to alter the benefits available to its Medicare-eligible retirees. (*See* ECF No. 12 at 4–5, ¶¶ 13–14.) The Union and Constellium have been parties to several collective bargaining agreements ("CBA"s) from 1999 to the present. (*See* 2:18-cv-1414, ECF

---

[1] This is a consolidated action with the above-styled action designated as the lead case. (*See* ECF No. 11.) The Union's brief in support of its motion and Constellium's brief in response to the Union's motion were both filed in the member case before consolidation. (*See* 2:18-cv-1414, ECF Nos. 1, 5, 11.) Those briefs are not on the docket in this case. Thus, the Court will refer to the docket numbers in the member case for those briefs in this memorandum opinion and order.

1

No. 11 at 4.) The most recent CBA, and the one that is the subject of this action, was entered into by the parties on September 19, 2017 and is effective through September 19, 2022. (ECF No. 12 at 2, ¶ 5.)

Article 10 of the CBA establishes a grievance procedure for disputes between the parties. (*Id.* ¶ 6.) It defines a grievance as, "any differences . . . between the Company and the Union as to the meaning or application of the provisions of this Agreement, or as to any question relating to the wages, hours of work, or other conditions of employment of any employee[.]" (ECF No. 12-1 at 11 (CBA).) The Article further establishes a four-step process for resolving grievances with the final step being arbitration. (*See id.*) In order to reach arbitration, the CBA provides that a representative from the International Union must appeal a Step 3 denial of a grievance within 30 days. (*See id.* at 12.)

Article 15 of the CBA, governs current and retired employees' health benefits and states the following:

> A. Group Insurance
>
> 1. The group insurance benefits shall be set forth in booklets entitled Employees' Group Insurance Program and Retired Employees' Group Insurance Program, and such booklets are incorporated herein and made a part of this 2017 Labor Agreement by such reference.
>
> 2. It is understood that this Agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on September 19, 2017, except as otherwise provided in the applicable booklet, and further that such benefits shall remain in effect for the term of this 2017 Labor Agreement.

(*See id.* at 16.) This benefit language is virtually identical to the language in previous CBAs, with the only difference being the date of the identified CBA and the effective date. (*See* 2:18-cv-1414, ECF No. 5 at 3.) The parties also negotiated for and appended a "Cap Letter" to the CBA, which

outlined the benefits for employees who retired on or after January 1, 2003. (*See* ECF No. 12-1 at 18.) The Cap Letter further states that these retirees are eligible for retiree medical coverage and establishes the average annual contributions that Constellium would pay for all healthcare benefits per each participating retiree who retired on or after January 1, 2003. (*See id.*) The Parties also memorialized benefits in a Retired Employees' Group Insurance Program Booklet that refers to the summary plan description ("SPD") for retiree health benefits. (*See* 2:18-cv-1414, ECF No. 5 at 3 n.1.) However, the parties disagree as to whether this booklet refers to the 1995 SPD or 2005 SPD. (*See id.*) Nevertheless, both SPDs provide for group medical and drug coverage for retirees which are to remain in effect for the term of the CBA. (*See id.*; *see also* ECF No. 6 at 5.)

On August 24, 2018, Constellium sent a letter to its Medicare-eligible retirees stating that, starting January 1, 2019, Constellium was terminating the employer provided group medical and drug coverage for Medicare-eligible retirees and, instead, these retirees could purchase supplemental Medicare insurance from Aon Retiree Health Exchange ("Aon"). (*See* ECF No. 12-5 at 1.) The letter also stated that Constellium was establishing Health Reimbursement Accounts ("HRA"s) into which Constellium would deposit $4,500 per year for each retiree and his or her spouse. (*See id.*) These retirees are required to sign up for coverage with Aon by December 7, 2018 or forfeit the ability to utilize Aon or receive any deposit by Constellium into an HRA in the future. (*See id.*)

On September 7, 2018, the Union filed a grievance pursuant to the grievance process outlined in Article 10 of the CBA. (*See* ECF No. 12-6.) This grievance stated that Constellium "made a unilateral change to the Contract Agreement dated September 19[,] 2017 regarding the agreed to cap letters which is encompassed with this Contract of September 19[,] 2017 . . . ." (*Id.*) The grievance further requested that Constellium cease and desist this unilateral change. (*Id.*)

On October 2, 2018, Constellium denied the grievance stating that the change did not violate the CBA and that, to the extent that the change impacted retirees who retired under previous CBAs, the change was allowed under the Fourth Circuit's decision in *Barton v. Constellium Rolled Prod.-Ravenswood, LLC*, 856 F.3d 348 (4th Cir. 2017). (ECF No. 12-7.) On October 4, 2018, the Union demanded arbitration of the grievance. To date, no arbitration has occurred.

On November 2, 2018, Constellium filed its action for declaratory judgment requesting a declaration from the Court regarding Constellium's ability to make unilateral changes to the health plan for the above group of retirees.[2] (ECF No. 1.) The Union subsequently filed its present action for a preliminary injunction on November 7, 2018, requesting that the Court issue a preliminary injunction to stop Constellium from implementing the above healthcare changes prior to an arbitration award. (2:18-cv-1414, ECF No. 1.) Constellium timely responded to the Union's motion. (*See* 2:18-cv-1414, ECF No. 11.) This Court held a Preliminary Injunction hearing on November 26, 2018. As such, the motion is fully briefed and ripe for adjudication.

## II. LEGAL STANDARD

Section 301 of the Labor Management Relations Act ("LMRA") provides the following:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

---

[2] Constellium also filed a separate motion to stay arbitration and for declaratory judgment. (ECF No. 5.) Specifically, Constellium requests that the Court declare that Constellium can unilaterally change the healthcare benefits for its retirees who retired prior to the effective date of the 2017 CBA and that the Court stay the Union's request to arbitrate the grievance at issue in this case. (*See id.*) Constellium's argument in their motion is centered on the arbitrability of the Union's grievance. (*See id.* at .17–19.) As this memorandum opinion and order finds that the Union's grievance is arbitrable, *see supra* Part III.A., the Court **DENIES** the motion insofar as it requests a stay of the arbitration. (ECF No. 5.) Further, having found that the grievance is arbitrable, any substantive issues pertaining to grievance, such as the interpretation of the CBA and whether the grievance is precluded by estoppel, must be determined by the arbitrator. *See Local 1422, Int'l Longshoremen's Ass'n v. S.C. Stevedores Ass'n*, 170 F.3d 407, 410 (4th Cir. 1999); *see also, Schweizer Aircraft Corp. v. UAW*, 29 F.3d 83, 88 (2d Cir. 1994). Thus, the Court further **DENIES**, **WITHOUT PREJUDICE**, the motion insofar as it requests declaratory judgment. (ECF No. 5.)

29 U.S.C. 185(a). However, the Norris-LaGuardia Act ("NLA") severely limits the Court's jurisdiction to issue any temporary restraining order or preliminary or permanent injunction in cases involving or growing out of labor disputes and provides the following:

> No Court of the United States . . . shall have jurisdiction to enter any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this Act; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this Act.

29 U.S.C. § 101. Section 7 of the NLA lists the procedural requirements for issuing a restraining order or injunction under the NLA.

The Supreme Court in *Boys Markets, Inc. v. Retail Clerks Union, Local 770* carved out a limited exception to the prohibition in the NLA. *See* 398 U.S. 235 (1970). In that case, the Supreme Court held that, because of the importance of arbitration as an instrument for resolving labor disputes, the NLA should not be construed as prohibiting the issuance of injunctions to preserve the *status quo* in labor disputes pending arbitration where there is a binding grievance procedure and arbitration agreement. *See id.* at 242. In *Buffalo Forge Co. v. United Steelworkers*, the Supreme Court made clear that the Court's decision in *Boy's Market* only dealt "with the situation in which the collective-bargaining contract contained mandatory grievance and arbitration procedures." 428 U.S. 397, 406 (1976); *see also Columbia Local, Am. Postal Workers Union v. Bolger*, 621 F.2d 615, 617 (4th Cir. 1980) ("[*Buffalo Forge*] made clear that *Boys Markets* 'authority to enjoin was limited to injunctions to enforce the union's promise to arbitrate.'")

Although the above cases involved injunctions to enjoin unions from striking in order to enforce the union's promise to arbitrate, these principles also apply to suits "by [a] union seeking to enjoin actions by employers over which the union has filed grievance under a mandatory arbitration

5

procedure." *Bolger*, 621 F.2d at 617; *see also Lever Bros. Co. v. Int'l Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976) ("Further, the rule contained in this case is obviously a two-sided coin. An injunction to preserve the *status quo* pending arbitration may be issued either against a company or against a union in an appropriate *Boys Markets* case . . . .).

Thus, pursuant to the above authorities a Court may issue an injunction under *Boys Markets* "where it is necessary to prevent conduct by the party enjoined from rendering the arbitral process a hollow formality in those instances where . . . the arbitral award when rendered could not return the parties substantially to the *status quo ante*." *Lever Bros.*, 554 F.2d at 123; *see also Bolger*, 621 F.2d at 618 ("Under [the above authorities] the appropriate test for issuance of injunction in the instant case is whether the conduct proposed must be enjoined because the available arbitral process could not possibly restore the *status quo ante* in an acceptable form were that conduct to be found violative of contract rights. This would render the arbitral process a hollow formality and necessitate injunction maintaining the *status quo* pending arbitration.").

### III. DISCUSSION

As stated above, the Union is seeking a preliminary injunction to preclude Constellium from unilaterally altering the healthcare benefits for its Medicare-eligible retirees pending arbitration on that matter. (*See* ECF No. 12.) Constellium, however, opposes the injunction and argues that the Union has failed to establish the four elements courts generally require a plaintiff to show before issuing a preliminary injunction. (*See* ECF No. 11 at 7.)

As discussed more fully above, the Supreme Court in *Boys Markets* narrowly held that a Court may issue a preliminary injunction to preserve the *status quo* pending arbitration in a labor dispute where both parties are bound by an agreement to arbitrate the grievance at issue. *See Boys Markets*, 398 U.S. at 254 ("Our holding in the present case is a narrow one. . . . We deal only with

the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure."). In reaching this holding, the Supreme Court analyzed the history of the NLA and the NLA's goal to severely limit the power of the federal courts to issue injunctions as the federal courts were generally regarded as being aligned with management against the unions. *See id.* at 251. The Court then emphasized Congress's shift from protecting labor unions against potentially biased federal courts to protecting the peaceful resolution of labor disputes through arbitration. *See id.* at 251–52 ("Norris-LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process."). The Court further stated, "that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes." *Id.* at 253. Thus, the Court created the above limited exception to the NLA's bar against issuing injunctions in labor disputes and stated, "that the core purpose of the [NLA] is not sacrificed by the limited use of equitable remedies to further this important policy . . . ." *Id.*

The Fourth Circuit in *Lever Brothers Co. v. International Chemical Workers Union, Local 217* upheld a district court's decision to issue a preliminary injunction blocking an employer's decision to transfer a facility from one state to another and thereby deprive workers of their jobs. *See* 554 F.2d 115. In doing so, the Court adopted the following test for determining whether a *Boys Markets* injunction is warranted:

> [A] plaintiff, without regard to whether he is the employer or the union, seeking to maintain the *status quo* pending arbitration pursuant to the principles of *Boys Markets* need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. If there is a genuine dispute with respect to an arbitrable issue, the barrier [to the issuance of an injunction] we believe appropriate[ly] has been cleared.

7

554 F.2d at 120; *see also Bolger*, 621 F.2d at 618 (internal quotation marks omitted) (quoting *Amalgamated Transit Union, Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073 (9th Cir. 1976)). The Fourth Circuit further reiterated the importance the Supreme Court in *Boys Markets* placed on promoting and encouraging the arbitration process to resolve labor disputes and stated that these injunctions are necessary to prevent the arbitral process from becoming a hollow formality. *See id.* at 123.

Additionally, later Fourth Circuit decisions have generally required a plaintiff seeking a preliminary injunction to show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Int'l Union v. Consol Energy, Inc.*, 243 F. Supp. 3d 755, 763 (S.D. W. Va. 2017) (citing *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). For preliminary, as opposed to permanent, injunctions, "[t]he evidentiary standard applied in determining whether a plaintiff has established all four necessary elements is substantially relaxed, given that the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Marietta Mem'l Hosp. v. W. VA. Health Care Auth.*, No. 2:16-cv-08603, 2016 WL 7363052 (S.D. W. Va. Dec. 19, 2016) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

However, for *Boys Markets* injunctions, before addressing whether the plaintiff has sufficiently made a showing as to the above factors, a court must first determine whether the grievance in question is arbitrable pursuant to a binding agreement between the parties. *See Boys Markets*, 398 U.S. at 253 ("[T]he District Court may issue no injunctive order until it first holds that the contract does have that effect . . . ."); *see also Nat'l Mine Serv. Co., United Steelworkers*, 385 F.

Supp. 856, 859 (N.D. W. Va. 1975) ("The initial finding of fact which must be made under *Boys Markets* to maintain jurisdiction in such circumstances, of course, is that the parties are, in fact, bound by their agreement to submit the 'labor dispute' to arbitration.")

A. *Arbitrability*

As stated above, the grievance at issue here is whether Constellium's unilateral decision to change healthcare coverage for its Medicare-eligible retirees who retired on or before January 1, 2003 violates the 2017 CBA and Cap Letter in which, the Union argues, Constellium agreed to keep these benefits in place. (*See* ECF No. 5 at 6, 8–9.) The Union argues that the broad arbitration agreement clearly covers the above grievance. (*See id.*) Constellium, however, argues that the grievance is not arbitrable because, under the CBA, the Local Union cannot advance the grievance to arbitration and the International Union waived its right to appeal the grievance to arbitration by failing to timely appeal the denial of the grievance.[3] (*See* 2:18-cv-1414, ECF No. 11 at 17.)

A court resolving an arbitrability dispute must first "determine who decides a particular dispute is arbitrable—the arbitrator or the court" before turning to "whether the dispute is, in fact, arbitrable." *See Peabody Holding Co., LLC v. UMWA*, 665 F.3d 96, 102 (4th Cir. 2012). The Fourth Circuit has held that "the question of arbitrability is undeniably an issue for judicial determination" unless the arbitration agreement clearly and unmistakably provides that the arbitrator shall determine what disputes the parties agreed to arbitrate. *See id.* (internal quotation marks omitted) (quoting *AT&T Technologies Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 649

---

[3] Constellium also argues that the grievance is not arbitrable because it is barred by the Fourth Circuit's opinion in *Barton*. (*See* 2:18-cv-1414, ECF No. 11 at 17.) However, the Fourth Circuit has held that "[w]hen evaluating arbitrability, we must not accept a party's invitations to critically appraise the merits of the underlying dispute." *See Peabody Holding Co., LLC v. UMWA*, 665 F.3d 96, 104 (4th Cir. 2012); *see also Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 873–74 (4th Cir. 2016) ("Procedural questions arise once the obligation to arbitrate a matter is established, and may include such issues as the application of statutes of limitations, notice requirements, laches, and estoppel. . . . The Court has explained that these are questions for the arbitrator. . . .").

(1986)). "'Question[s] of arbitrability' thus include questions regarding the existence of a legally binding and valid arbitration agreement, as well as questions regarding the scope of a concededly binding arbitration agreement." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 78 (2010).

Here, the arbitration clause in the CBA is quite broad and provides that "any difference" that should arise between Constellium and the Union regarding "the meaning or application of the provisions" of the CBA shall be disposed of in the grievance process. (*See* ECF No. 12-1 at 11.) It then delineates a multi-step grievance procedure that culminates with an option to arbitrate. (*See id.* at 11–12.)

First, the parties here do not dispute the binding nature of the arbitration clause contained in the CBA nor do they dispute whether the Court can decide whether the grievance here is arbitrable. Further, the arbitration agreement, though broad, does not clearly and unmistakably provide that the arbitrator must decide what disputes the parties agreed to arbitrate. *See Peabody Holding Co.*, 655 F.3d at 102 ("The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice."). (*See also* ECF No. 12-1 at 11.) Thus, here, it is for the Court to decide whether the grievance is arbitrable.

Second, the grievance pertains to the "meaning or application of the provisions" of the CBA and thus falls directly into the type of conflict the arbitration clause envisions being decided through the grievance process. (*See also* ECF No. 12-1 at 11.) Additionally, nothing in the CBA excludes this issue from arbitration. *See Peabody Holding Co.*, 655 F.3d at 104 (finding that there is a presumption of arbitrability of a particular grievance unless there is "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" (internal quotation marks omitted) (quoting *AT&T Technologies Inc.*, 475 U.S. at 650)); *see also Lever Bros.*,

554 F.2d at 119 (finding that the district court correctly held the grievance was arbitrable where the contract did not expressly exclude a particular grievance from arbitration).

Further, the Supreme Court has stated, "[o]nce it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964); *see also Del Webb Cmtys. v. Carlson*, 817 F.3d 867, 873–74 (4th Cir. 2016). Procedural issues include "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *see also Del Webb Cmtys., Inc.*, 817 F.3d at 873–74. Thus, here, it is for the arbitrator, and not the Court, to decide whether the grievance procedure was correctly followed. Accordingly, the Court finds that the issue here is arbitrable.

B.  *Likelihood of Success on the Merits*

As stated above, the Fourth Circuit has traditionally required a plaintiff seeking a preliminary injunction to show that the plaintiff is likely to succeed on the merits. *See Winters*, 555 U.S. at 20. However, for *Boys Markets* injunctions to preserve the *status quo* pending arbitration, a plaintiff "need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." *Lever Bros.*, 554 F.2d at 120. As stated above, a plaintiff clears this barrier "[i]f there is a genuine dispute with respect to an arbitrable issue." *Id.* In evaluating whether there is a genuine dispute with respect to an arbitrable issue, the Court should avoid examining the merits. *See id.* at 123.

Here, the Union's position is that Constellium cannot unilaterally alter the healthcare benefits for its Medicare-eligible retirees because of the promises Constellium made regarding these

benefits in the current CBA that are to remain in effect for the term of that CBA. (*See* 2:18-v-1414, ECF No. 5 at 11.) Constellium, however, argues that arbitration of the Union's grievance would be futile because the issue that underlies the grievance is precluded by the Fourth Circuit's decision in *Barton*. (*See* 2:18-cv-1414, ECF No. 11 at 11–13.)

However, this Court has already found above that the grievance at issue here is arbitrable. Thus, the merits of the grievance are for the arbitrator to decide. *See supra* Part III.A. *See Int'l Brotherhood of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2018) ("As to likelihood of success on the merits, the [district] court explained, because the merits of the contract dispute are reserved to the arbitrator, the relevant inquiry is limited to whether the parties' dispute is subject to arbitration . . . ."); *Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1335, 1342 (4th Cir. 1978) (finding that the district court "misconstrued" the likelihood of success requirement to necessitate a showing that the union would prevail on the merits of its dispute). Accordingly, the Court finds that the Union has satisfied this requirement.

C. *Irreparable Harm*

Second, in determining whether to issue a preliminary injunction, courts have required plaintiffs to show that, absent the injunction, the plaintiff would suffer irreparable harm. *See Winters,* 555 U.S. at 20. In the context of *Boys Markets* injunctions, a plaintiff satisfies the irreparable harm requirement by showing that, "in the absence of an injunction preserving the *status quo*, the company's conduct is likely to harm the arbitral process itself" such that the arbitral process would only be a "hollow formality." *See Consol Energy*, 243 F. Supp. 2d at 765; *see also Lever Bros.*, 554 F.2d at 123.

Here, Constellium plans to terminate the retiree healthcare benefits for its Medicare-eligible retirees and instead outsource these retirees' healthcare coverage to Aon. Thus, were the Court to

not issue a preliminary injunction, Constellium would terminate Medicare-eligible retiree healthcare benefits and these retirees would bear the burden of signing up for coverage or risk losing healthcare coverage completely. If the Union won in arbitration, the Union would have to convince the arbitrator that Constellium improperly outsourced the healthcare benefits and that the proper award would be for Constellium to return to administering the benefits. During this time, retirees who did not sign up for healthcare with Aon would be without healthcare and could possibly have to forego important medical procedures or treatments. Thus, an arbitrator could not return these retirees to the *status quo ante* and the arbitration process that the Union contracted for would be a "hollow formality". *See Consol Energy*, 243 F. Supp. 2d at 765 ("In light of the *Lever Brothers* analysis, it suffices for Plaintiffs to show that in the absence of an injunction preserving the *status quo*, the company's conduct is likely to harm the arbitral process itself . . . . Additionally, an arbitrator is not likely to be able to remedy the termination of retiree health insurance that threatens harm, and such terminations should be preliminarily enjoined"); *see, e.g.*, *Int'l Union, UAW v. Exide Corp.*, 688 F. Supp. 174, 186 (E.D. Pa. 1988) (finding that arbitration would be a hollow formality if the company was permitted to drastically cut medical coverage for its employees pending arbitration and some of its employees are unable to obtain medical care as a result of the cut.)

Although they are not separate parties to this action, the Court would be remiss not to acknowledge the harms the affected retirees, who the Union contracted benefits for, will suffer as a result of Constellium's action. The Union attached eleven affidavits to its motion from the affected retirees to show that an arbitration award could not return the retirees substantially to the *status quo ante*. (*See* ECF Nos. 12-9–12-18.) Most, if not all, of the retirees stated in their affidavits that they suffer from serious, expensive medical conditions such as cancer. (*See, e.g.*,

ECF No. 12-9 (Atherton Aff.) (stating that he and his wife, who are both in their 80s, have serious medical conditions that require them to take medications that costs tens of thousands of dollars a year); ECF No. 12-10 (Cundiff Aff.) (stating that he suffers from cancer, lung disease, and diabetes); ECF No. 12-16 (Law Aff.) (stating that she is a spouse of a deceased retiree and that she suffers from legal blindness and side effects from her hip replacement).) Additionally, several of these retirees are about to undergo expensive medical procedures. (*See, e.g.*, ECF No. 12-13 (Hendricks Aff.) (stating that he is about to undergo surgery to treat his prostate and pelvic bone cancer); ECF No. 12-18 (Stanley Aff.) (stating that he was recently diagnosed with pancreatic cancer for which he will have to receive treatment immediately).) These affidavits are just a small sample from the over one thousand[4] retirees affected by Constellium's unilateral decision. Courts have considered the above types of facts in determining whether there would be irreparable harm in the context of terminating retiree health insurance. *See, e.g.*, *Consol Energy*, 243 F. Supp. 2d at 765 (citing *United Steelworkers of Am. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987)).

Constellium argues that it is simply changing how retiree healthcare benefits are delivered and thus, the affected retirees will still have healthcare benefits. (*See* 2:18-cv-1414, ECF No. 11 at 14.) Constellium further argues that any economic harm that the affected retirees would incur as a result of Constellium's action can be monetarily compensated and, thus, there is no irreparable harm. (*See id.* at 15 (citing *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 692 (4th Cir. 1994)).) However, Constellium's argument fails to account for the burden placed on retirees to sign up for healthcare through Aon. Many retirees have already expressed difficulty in

---

[4] The Court does not know the exact number of retirees that will be affected. However, in the Preliminary Injunction hearing held in this case, Constellium stated that 600 of the affected retirees had signed up for healthcare through Aon and the Union stated that about 900 retirees still had not signed up. Thus, the Court assumes that over one thousand retirees will be affected by the change. As stated above, this is based on a rough draft of the hearing transcript, and, accordingly, the Court does not have a direct citation.

trying to obtain health insurance from Aon that would be comparable to what they had under their Constellium administered plans. (*See, e.g.*, ECF No. 12-9 (Atherton Aff.) (stating that he was unable to attend the Aon information sessions or access Aon's website); ECF No. 12-12 (Flinn Aff.) (stating that he attended the Aon information session but that it was confusing and that he attempted to research the plans online but not all of the plans were available); ECF No. 12-16 (Law Aff.) (stating that she spoke to an Aon representative but that the information was confusing and, because she is legally blind, she cannot access the online resources).) This will undoubtedly result in many retirees not obtaining health insurance. *See, e.g.*, *Consol Energy*, 243 F. Supp. 3d at 767 (finding that the plaintiff suffered irreparable harm where retirees bore the administrative and financial risks); *see also Exide Corp.,* 688 F. Supp. at 186–88 (finding irreparable injury where the company sought to drastically reduce health insurance benefits even though the arbitrator could reimburse expenses). As these retirees would not be made whole by an arbitration award, the grievance and arbitration process that the Union specifically contracted for to resolve these types of disputes would be rendered ineffective. Accordingly, the Union has sufficiently shown that it will suffer irreparable harm absent the preliminary injunction.

  D. *Balance of Equities*

  Third, a plaintiff seeking a preliminary injunction must show that the balance of equities favors the granting of a preliminary injunction. *See Winters,* 555 U.S. at 20. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

  The Union argues that the potential harms to the Union and the Medicare-eligible retirees it bargained benefits for outweighs the cost to Constellium of maintaining healthcare coverage for

these retirees pending arbitration. (*See* 2:18-cv-1414, ECF No. 5 at 16.) Constellium argues that the cost of re-litigating the issues already decided in *Barton* and the cost it has already expended in designing and implementing the new healthcare program outweighs the cost incurred by the Union.

The Court agrees with the Union that the balance of hardships weighs in favor of granting the preliminary injunction. As discussed more fully above, the Union has demonstrated that it will suffer irreparable harm should Constellium be allowed to proceed with its termination and outsourcing of the retiree healthcare benefits. Additionally, as Constellium has already designed the new plan for administering these healthcare benefits, should the Court issue the injunction, Constellium would only be required to wait on implementing this plan. Should Constellium win in arbitration, it could start implementation immediately. At most, Constellium would miss out on the savings that it would have incurred in not having to provide health insurance for the amount of time it took an arbitration award to be issued. This savings could be properly recovered through an injunction bond should it be found that the Court improperly issued the injunction.

Contrarily, as discussed at length above, the Union and the affected retirees, would not be able to easily recoup their losses should they win in arbitration. *See Consol Energy*, 243 F. Supp. 3d at 767 ("The balance of equities clearly tips in favor of Plaintiffs. In the absence of an injunction, medical benefits may be lost. Defendant CONSOL Energy, should it ultimately prevail, and be deemed entitled to cancel or change benefits, can still do so after the matter is concluded.") Thus, the balance of equities weighs in favor of issuing the injunction.

E. *Public Interest*

Fourth, a plaintiff seeking a preliminary injunction must show that the injunction is in the public interest. *See Winters,* 555 U.S. at 20. The Union argues that public policy weighs in favor of resolving labor disputes through arbitration and in providing medical benefits to the sick and

injured. (*See* 2:18-cv-1414, ECF No. 5 at 16–17.) Constellium, however, argues that there is a strong public policy in not re-litigating issues that have already been decided by a federal court. (*See* 2:18-cv-1414, ECF No. 11 at 16.)

However, this District has found that that it is within the public interest to enter an injunction in cases involving labor disputes over healthcare benefits as there is a desire throughout society to provide medical benefits for the sick and injured. *See Consol Energy*, 243 F. Supp. 2d at 767 ("Because of the public policy favoring injunctions in such cases and the desire throughout society to provide medical benefits for the sick and the injured, an injunction is in the public interest."). Further, as discussed more fully above, it is not for the Court to decide here whether the grievance is precluded by *Barton*. Thus, this element weighs in favor of issuing a preliminary injunction.

In summary, the Court finds that the Union has demonstrated a genuine dispute as to an arbitrable issue, the Union is likely to suffer irreparable harm, the balance of hardships tips in the Union's favor, and a preliminary injunction is in the public interest. The Court therefore finds that the Union has satisfied each of the requirements for a preliminary injunction, *see Lever Bros.*, 554 F.2d at 123, and this extraordinary relief is warranted in this case.

F. *Bond*

Lastly, Federal Rule of Civil Procedure 65(c) provides, in pertinent part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citations omitted). [R]ecoverable damages under such a bond are those that arise from

the operation of the injunction itself and not from damages occasioned by the suit independently of the injunction." *Lever Bros.*, 554 F.2d at 120.

Here, Constellium has requested that the Court issue a $1,000,000 bond. (*See* 2:18-cv-1414, ECF No. 11 at 18–19.) Constellium argues that this amount is proper because the cost Constellium will incur if the healthcare changes are stopped or delayed could "easily run into seven figures." (*See id.* at 19.) In the Preliminary Injunction hearing, the Union agreed to an injunctive bond, but believes that the bond amount that Constellium requests is excessive. The Union believes that a $10,000 bond is more appropriate in this case. In support of its position, the Union directs the Court to this District's decision in *Consol Energy* in which a $10,000 bond was entered under similar circumstances.

While the Court believes that an injunctive bond is appropriate here, the Court does not agree with Constellium that the bond should be in the seven figures. Further, Constellium has failed to provide evidence to support its proposed amount, including the amount it would save if it implemented the healthcare change as planned. As such, the Court does not accept Constellium's proposed bond figure. *See, e.g.*, *Atlantic Coast Pipeline, LLC v. 5.63 Acres*, No. 6:17-cv-84, 2018 WL 1097051, at *17 (W.D. Va. Feb. 28, 2018) (stating that the burden was on the defendant to establish the appropriate bond); *Philips Elecs. North am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 n.14 (M.D.N.C. 2009) ("The burden rests with [defendant] to establish the amount of bond necessary to secure against the wrongful issuance of an injunction.").

In a similar case, this District required the union in that case to post a $10,000 bond. (*See* 1:16-cv-12506, ECF No. 59 (showing that the union in that case posted a $10,000 injunction bond).) Thus, based on the record as it currently stands, in order to ensure that there are funds to compensate Constellium should it successfully establish that the preliminary injunction was

improper and that it wrongfully sustained damages as a result of this injunction, the Court finds it appropriate to require the Union to post a bond of $10,000. *See, e.g.*, *Stilp v. Contino*, 629 F. Supp. 2d 449, 467–68 (M.D. Pa. 2009) (stating that, because the parties did not submit any evidence of the financial burden, the court could use its discretion in determining the bond). The bond must be posted by December 10, 2018. Failure to post the bond will result in dissolution of the injunction. Should the parties wish to more fully develop the record on the appropriate bond amount, the parties may submit materials to the Court on or before December 10, 2018.

### IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Union's motion for preliminary injunction, (ECF No. 12; 2:18-cv-1414, ECF No. 1), and **PRELIMINARILY ENJOINS AND ORDERS** Constellium not to terminate its provision of healthcare benefits to its Medicare-eligible retirees as stated in the August 24, 2018 letter pending arbitration. The Court further **ORDERS** that the Union post a $10,000 bond by **December 10, 2018**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: December 4, 2018

_____
THOMAS E. JOHNSTON, CHIEF JUDGE